IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN REYNOLDS,                   *
                Plaintiff,
       v.                   *   CIVIL ACTION NO. DKC-14-0532

LT. PENNINGTON, et al.,       *

            Defendants.     *
                       ***

## MEMORANDUM OPINION

Pending is a Motion to Dismiss, or in the alternative, Motion for Summary Judgment filed by former Warden Bobby P. Shearin, Governor Martin O'Malley, and Lt. Pennington.[1]  ECF No. 24.  Plaintiff has not filed a response.[2]  Upon review of the papers and exhibits filed, the court finds an oral hearing in this matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2014).  For the reasons stated below, the motion will be granted.

### Background

The case was instituted upon receipt of a civil rights complaint filed by Plaintiff John Reynolds, an inmate then held at the North Branch Correctional Institution ("NBCI").[3]  ECF No. 1.  Subsequently, Plaintiff filed an Amended Complaint.  ECF No. 19.  Generally, Plaintiff alleges that he was subjected to inhumane conditions of confinement while housed at NBCI, he

---

[1]     Although Plaintiff named several other correctional employees throughout the body of his Complaint and Amended Complaint, he did not name them as additional Defendants, they were not added to the docket, and service has not been effected upon them.  See ECF Nos. 1 and 19.

[2]     Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), on January 23, 2015, Plaintiff was notified that Defendants had filed a dispositive motion, the granting of which could result in the dismissal of his action.  ECF No. 25.  Plaintiff was also informed that he was entitled to file materials in opposition to that motion within seventeen (17) days from the date of that letter and that his failure to file a timely or responsive pleading or to illustrate, by affidavit or the like, a genuine dispute of material fact, could result in the dismissal of his case or in the entry of summary judgment without further notice of the court.  *Id.*  Plaintiff sought and was granted an extension of time to and including April 9, 2015, to file his opposition.  ECF Nos. 26 & 27.  To date, Plaintiff has filed nothing further with the court.

[3]     Plaintiff is currently confined at Patuxent Institution.  ECF No. 28.

was subjected to excessive force, and he was denied access to medical and psychological care. ECF Nos. 1 & 19.

A.      Excessive Force

Plaintiff states that on January 21, 2014, he was taken to Lt. Pennington's office to be interviewed regarding an administrative remedy complaint ("ARP") he filed regarding the closure of the cell windows in Housing Unit ("HU") 2 .  ECF No. 1, p. 2.[4]  Lt. Pennington asked Plaintiff to specify when he had a problem with "mace" being sprayed on the housing unit.  Plaintiff indicates that he advised Pennington he had not had a problem but expected he would. Pennington advised Plaintiff that the windows were closed for cost saving and security purposes. *Id*.  Plaintiff challenged Pennington's assertions, angering Pennington who advised Plaintiff that the closure of the windows was approved by the Warden and he need not explain himself to Plaintiff.  Plaintiff continued to argue with Pennington.  *Id*., p. 3.  Plaintiff states that Pennington became angrier, slamming his hand on the desk and yelling expletives at Plaintiff while advising him that Pennington was the housing unit manager and made the policies of the unit, not Plaintiff. *Id*.  Pennington ordered Plaintiff from his office, grabbing Plaintiff by his left wrist and arm and ripping Plaintiff out of the chair.  Plaintiff states he was handcuffed behind his back.  He states that Pennington pushed and twisted Plaintiff's arm over his head and Plaintiff felt his shoulder crack, a sharp pain in his left wrist, and a pulled muscle in his lower back and neck.  *Id*.

Officer Connor, who had been standing at the office door, assisted Pennington in dragging Plaintiff down the hallway.  Plaintiff told the officers to let go of him, he could walk on his own. Pennington continued to hurl insults and expletives at Plaintiff.  *Id*.  When they arrived at the holding cell, Pennington threw Plaintiff onto a concrete bench.  Pennington told Plaintiff that he,

---

[4]        Citations are to the court's electronic docket.

Pennington, ran the housing unit. Plaintiff states he could smell alcohol on Pennington's breath. Pennington then told Plaintiff that he was going to HU 1 (disciplinary segregation) because Plaintiff had threatened him. A short time later, Pennington came back and advised Plaintiff that he was not going to place him on disciplinary segregation. He reiterated that Pennington was in charge of the unit. Plaintiff states that due to his fear of Pennington he agreed with everything Pennington said. Pennington advised Plaintiff that his ARP regarding the closure of the windows was going to be dismissed and that if Plaintiff filed any other ARPS he would be sent to HU 1 and housed with an inmate who would attack him. *Id*. p. 4.

After returning to his cell, Plaintiff told Officer Connor that he wanted to be seen by medical because his neck, back and shoulder hurt from Pennington's handling of him. *Id*. p. 4. Connor advised Plaintiff that he had just caught a break and not to mess it up. *Id*.

Plaintiff claims that since the incident he has been on edge as Pennington is in charge of the unit and Plaintiff lives in fear of Pennington transferring him to disciplinary segregation and/or confining him with an inmate who will harm him. *Id*., pp. 4-5.

B.      Conditions of Confinement

Plaintiff alleges that he has been subjected to inhumane conditions of confinement due to the overcrowding of Maryland's prison system. *Id.,* p. 7. Plaintiff states that the cells at NBCI were designed as single cells but he has been forced to share the cell with other inmates. He notes that NBCI was designed for single occupancy to house the worst offenders. *Id*., p. 8. He claims that the conditions at NBCI breed violence amongst inmates and increase in suicides. *Id*.

Plaintiff states that each cell is only equipped for one inmate and there is no means for prisoners to evenly share the space, resulting in inmates using psychological intimidation and physical force to claim their part of the cell. *Id*., p. 9. Plaintiff indicates inmates are forced to eat

in their cells and there is no place to put their trays other than for one inmate to set his tray on the sink/toilet combination while the other inmate eats out of his lap. *Id.* He states there is no way to get into the top bunk other than using the sink/toilet as a ladder to climb on and jump off. He indicates it is easy to slip off the sink/toilet combination. *Id.*

Plaintiff alleges that since NBCI was designed to house inmates in single cells, the additional inmates adversely impact the opportunity for recreation. Plaintiff states that recreation periods are regularly cancelled. *Id.*, pp. 9-10.

Additionally, Plaintiff claims that cell assignments are done without classification procedures, resulting in the assignment of inmates with violent propensities being housed with "a young cellmate fresh in prison." *Id.*, p. 10. Plaintiff claims that "numerous inmates have been killed by their cellmates since NBCI has been double celled." *Id.*

Plaintiff states that each cell at NBCI is equipped with one vent for ventilation. Plaintiff claims that the vent does not consistently function. *Id.,* p. 11. Plaintiff indicates that while staff indicate that housing unit windows are closed as a cost saving measure, that in fact they are closed in retaliation for recent inmate-on-officer violence and in an effort to cause unnecessary pain and suffering, as the closing of the cell windows causes the cells to become extremely dry and hot. *Id.* Plaintiff states that he has awoken with nosebleeds and consistently felt nauseous and sick if moving about the cell, forcing him to try to sit still. *Id.* He indicates the windows in his housing unit were closed in early December of 2013 and the vents were not functioning from December 24, 2013 until approximately December 30, 2013. *Id.*, p. 11. The vents did not work again for several hours on January 3, 2014, and again from January 4, 2014 until January 6, 2014. *Id*, p. 12. The vents also stopped working from January 6, 2014 to January 10, 2014. *Id.* p. 12.

Plaintiff states that he submitted a sick call slip on December 27, 2013, complaining of the foregoing conditions and the resultant nosebleeds.  He was seen by a nurse on December 30, 2013, and provided nasal spray.  *Id*.  He submitted another sick call slip on January 6, 2014, complaining of a nosebleed.  He was seen on January 8, 2014, and advised the nurse that the nasal spray did not work, and that the problem was the condition in his cell.  He indicated to the nurse that he needed to be able to open his window when the vent was not working.  The nurse advised him that a nosebleed was not a serious medical condition and that nosebleeds happened sometimes in the winter.  He was advised to continue to use the nasal spray, which was all she was able to provide him, and she could not have his window opened or fix the ventilation system. *Id*., p. 12.

Plaintiff was again seen by the nurse on January 14, 2014, regarding his complaints of nosebleeds.  He requested to see the doctor.  *Id*., p. 12.  He was seen by the doctor on January 23, 2014, who also advised that the only treatment was the nasal spray and that the doctor could not order NBCI to open Plaintiff's window because a nosebleed was not a serious medical condition and Plaintiff was not at risk of serious harm.  *Id*.

Plaintiff complains that the trays he is served his meals on are also used by mental health and disciplinary segregation inmates who smear bodily fluids on the trays.  Plaintiff states that once a tray has been contaminated there is no way to clean it to make it sanitary.  *Id*., p. 12. Plaintiff states that although NBCI staff claim that all contaminated trays are disposed of, he claims it is impossible to know when the trays have been contaminated.  He states that the trays are made of a porous plastic that makes them a sponge for the things they come into contact with. *Id*., pp. 12-13.  Plaintiff claims the only preventative measure to insure food safety is the use of plastic inserts on the trays. *Id*., p. 13.

Plaintiff indicates that the diet he is served has a "mutually enforcing effect on [his] health" when coupled with the minimal exercise allotted. *Id.* Plaintiff claims that his diet is comprised mostly of starches which are known to cause diabetes and other health problems which he fears he will develop due to the combination of his diet and limited exercise. *Id.*

Plaintiff claims that on August 5, 2013, the entire prison was placed on lockdown. Plaintiff states he had no involvement in the incident but nevertheless was locked in his cell 24 hours per day, except for a shower once a week. He claims that he was subjected to the lockdown for approximately two months. *Id.*, p. 14. In late September or early October he began to receive one hour of recreation per week. *Id.* Plaintiff states that the delay in restoring recreation was an "exaggerated response" to the emergency necessitating the lockdown.

While housed on HU2 Plaintiff received one shower per week and one hour of out-of- cell exercise per week until December 9, 2013. *Id.* p. 15. In December, Plaintiff states he began to receive 2-3 hours per week out-of-cell exercise. On the days he was not provided out-of-cell exercise he was provided one hour of out-of-cell time which he could choose to spend either in the library or a room with telephone where he could call his family. *Id.*

Plaintiff indicates that all of the foregoing taken together deprive him of humane conditions of confinement. *Id.*, p. 16.

C.     Designation as member of Security Threat Group

Plaintiff claims that there is no due process regarding validation as a member of a security threat group ("STG"). *Id.*, p. 10. Plaintiff claims that he has attempted to have his STG designation removed for years but has been ignored or told vaguely that there is evidence to support the designation. Plaintiff states that he cannot review or challenge the evidence. *Id.* Plaintiff claims that his inability to remove the STG label puts him at risk in the event of a gang

war in the prison.  Additionally, he claims he is unable to hold any institutional job which earns

ten days good conduct credits per month, limiting him to assignment of jobs which only earn five

days of good conduct credits.  *Id*., p. 10-11

D.      Programming/Housing Assignment

Plaintiff states that in August of 2013 he was assigned to general population and signed up

to attend weekly Alcoholics Anonymous meetings and a weekly case management program, and

was on the waiting list to be assigned an institutional job so that he could earn money and good

conduct credits.  *Id*., p. 13-14.  Plaintiff states that subsequently he was not allowed to attend

Alcoholics' Anonymous meetings, institutional programs of any kind, or hold an institutional job.

*Id*., pp. 15-16.

On October 3, 2013, Plaintiff was taken to an interview with Pennington, his case

manager, and several other officers. Plaintiff states he was questioned regarding his sentence and

advised that a "level system" was going to be placed throughout the facility with only HU 4 being

general population.  He was advised that his file would be reviewed and a determination made as

to what level he would be placed in.  Plaintiff states no notice was given prior the meeting and he

was not allowed to present any evidence as to why he should not be removed from general

population.  *Id*., pp. 14-15.  Thereafter, Plaintiff states inmates were moved among the housing

units in an arbitrary fashion, with the administration picking and choosing who would be allowed

to remain in general population and who would be moved to more restrictive units.  Plaintiff

states he did not receive an inmate rule violation or formal disciplinary action in violation of his

right to due process.  He states he was removed from general population to a more restrictive unit

without due process.  *Id*., p. 15.

Plaintiff states there is no educational or vocational training provided at NBCI.  ECF No. 1, p. 18. Plaintiff states his release date is June of 2018 and he has no ability to prepare for release.  He claims he is kept on maximum security status by Case Manager Zies in retaliation for his filing a complaint against her in November 2013.  *Id.*

Plaintiff states that his assignment to NBCI and labeling as a member of a STG affects the duration of his sentence, since he cannot earn good conduct credits at the same rate as other inmates not so assigned.  *Id.*, p. 18. Plaintiff further claims that "Mutual Agreement Plan or MAP" wherein inmates are given a plan to stay out of trouble and complete certain programs in exchange for a reduction of sentence, are not available at NBCI.  Plaintiff claims he should be assigned to medium security.  *Id.*

Plaintiff alleges that each year he is entitled to a security classification review.  Plaintiff states that as a matter of due process he is entitled to notice prior to the hearing and an opportunity to be heard.  *Id.*, p. 17.  He claims that in 2013 he did not receive notice of his annual review, nor was he provided an opportunity to present any evidence regarding his security status. *Id.*  On December 5, 2013, he received notice that his security status was to remain "max."  No rationale for the determination was provided.  *Id.* p. 17-18.  In his amended complaint, Plaintiff indicates that on May 12, 2014, he was given a security reclassification hearing, without prior notice.  ECF 19, p. 1.  During the hearing Case Manager Zies told Plaintiff that she had received information regarding his affiliation with a STG and she was recommending his security level be raised from Max I to Max II.  *Id.*, p. 2.  Plaintiff states that he is not a member of any STG and has tried to correct this inaccuracy for years.  *Id.*  Zies advised Plaintiff to speak to Lt. Harbaugh or Sgt. Barnhart about his designation as a STG member.  *Id.*  Zies then gave him pamphlets on anger management and relaxation techniques.  *Id.*

8

During the security review, Plaintiff alleges Zies falsely identified Plaintiff as a sex offender registrant in order to fabricate a Prison Rape Elimination Act ("PREA") survey. *Id.*, p. 3. Plaintiff states a PREA alert was placed on Plaintiff's file. Plaintiff states that this erroneous designation became the basis for housing Plaintiff with a sex offender Najarred Walker, who had a history of violent confrontations with his cellmates.[5] *Id.*, p. 3. Plaintiff states that after weeks of housing with Walker it became clear that they were not compatible as cellmates and one of them needed to move in order to avoid violence. *Id.*, 3. Plaintiff and Walker wrote to the Housing Unit manager advising that they were not compatible as cellmates and needed to be moved into separate cells. *Id.*, p. 4. Plaintiff sates that Officer Whetstone advised him during the week of June 15, 2014, that Plaintiff would be moved into an empty cell. On June 19, 2014, Whetstone spoke to Plaintiff and Walker separately and advised each that the move was not going to happen because each inmate had a PREA alert status and they could only be housed with each other. *Id.* Plaintiff has provided an affidavit from Walker confirming the foregoing. ECF No. 19-1. Plaintiff has also provided an affidavit from inmate Arthur Phillips confirming that Whetstone advised him that his plan to share a cell with Plaintiff would not happen because of Plaintiff's PREA alert. ECF No. 19-2.[6]

Plaintiff states that over the next month he wrote to the social worker, case manager, and warden explaining the problem of being forced to cell with Walker and seeking the removal of the PREA tag. Plaintiff states he also sought information as how, why, and when the tag had been applied to him. Plaintiff states that the replies only indicated that the PREA tags were intended to

---

[5]     Plaintiff has provided an affidavit from inmate Kevin Fuller who states he was involved with a violent confrontation with Walker on September of 2014 when he shared a cell with Walker. ECF No. 19-4.

[6]     Inmate Ronald Franklin avers that he has also been tagged under PREA and agreed to share a cell with Plaintiff in July of 2014, but this request was denied. He states that he was also advised that he could not house with non-PREA tagged inmates. ECF No. 19-3.

prevent rape and failed to respond to his other inquiries.  He was not advised how to remove the tag.  *Id*.  Believing that Plaintiff's cell assignment would not be changed, Plaintiff states that he refused to lock into his cell on July 21, 2014, in order to avoid serious bodily harm.  Plaintiff indicates that the refusal to lock in his cell could earn a disciplinary segregation term but while awaiting adjustment in a holding cell Officer Lease asked Plaintiff why he refused housing.  When Plaintiff explained why, Lease advised Plaintiff that he would not be served with a disciplinary segregation notice and moved him into an empty cell.  *Id*.

Plaintiff states that the following day Zies and Anita Rozas answered Plaintiff's requests to have the PREA tag removed.  He was called for an interview and asked why he wanted the tag removed.  *Id*., pp. 5-6.  Plaintiff was advised that the PREA tag was placed on his file as a result of responses he had provided during his security review.  *Id*., p. 6.  Plaintiff maintains that he had not received a security review the prior year due to the prison being locked down.  *Id*.  Plaintiff was administered the PREA survey again and as a result of his answers the PREA tag was removed.  Plaintiff indicates that Zies "might have" fabricated the PREA survey.  *Id*.  On September 10, 2014, Plaintiff received correspondence from Case Management Manager Roderick stating that after Plaintiff's interview with Rozas, Plaintiff "changed his story regarding his educational" history.  Plaintiff states this is when he became aware the PREA survey had been fabricated as he never discussed his educational history with anyone other than saying he received his GED when he was 16.  *Id*., p. 6.

Thereafter, Plaintiff states that he was advised he was scheduled for an interview with Social Worker Nice.  Plaintiff indicates that at the time of the interview he wrote Nice a request slip asking her the basis of the interview, which she did not respond to.  Plaintiff terminated the

interview without comment, having not received the response in the manner he desired.  *Id.*, pp. 6-7.

Plaintiff claims that Zies entered the PREA tag and conducted his reclassification hearing without notice in retaliation for his "exercise of his 1st Amendment rights" and having filed ARPs.  *Id.*

E.      Mail/ARP claims

Plaintiff states that in late October or early November of 2013, he received a piece of mail torn in half by an unidentified mail room employee.  ECF No. 1, p. 17.  Plaintiff states that it is the responsibility of case managers to assist inmates in filing ARPs and making legal copies. Plaintiff states that Case Manager Zies refused to copy Plaintiff's mail so that he could attach it as evidence to his ARP.  He states he filed the ARP without the attachment and it was dismissed by Warden Shearin.  *Id.*

Plaintiff indicates that Warden Shearin and his staff deviate from the policies and procedures set forth for processing ARPs.  Plaintiff states that staff dismiss his complaints "by any means necessary without investigating or ruling on the merits."  *Id.*, p. 19.  He indicates that each of his grievances are denied at every level in an effort to deprive him of his rights.  *Id.*, pp. 19-21.  Plaintiff attached to his complaint copies of a number of ARPs he filed.  ECF Nos. 1-8, 1-11 – 1-27.

F.      Mental Health Treatment

During the last week of January, 2014, Plaintiff submitted a request to the NBCI psychology department asking to be seen.  Plaintiff states that as of March 9, 2014, he had received no response.  *Id.*, p. 8.  On April 18, 2014, Plaintiff was interviewed by NBCI counsellor Laura Booth.  At that time, Plaintiff described the conditions of confinement and circumstances

causing Plaintiff mental difficulties. *Id*. Booth asked Plaintiff what he wanted her to do about his complaints. Plaintiff responded that it was not his job to tell her what to do, he was asking for whatever help was available through the NBCI psychology department. *Id*. pp. 6-9. Booth inquired as to Plaintiff's mental health history and advised Plaintiff he needed to obtain documentation concerning his prior mental health issues. Booth indicated she would give him 30 days to acquire the documentation and would schedule him for another interview at that time. *Id*. p. 9.

Plaintiff was interviewed by Booth on May 15, 2014, and at that time shared admission and discharge documents from the Potomac Ridge Behavior Health Facility demonstrating that he had been hospitalized twice when he was 13 for attempted suicide. Plaintiff was unable to obtain other documentation. *Id*., p. 9. Booth advised that she would see what she could do and scheduled Plaintiff for another interview in 30 days. Two weeks after Plaintiff should have been seen he submitted a request asking why he had not been scheduled. Plaintiff did not receive a response until September 9, 2014, which indicated he would be seen soon. He was not scheduled until October 22, 2014. *Id*., p. 10.

On October 22, 2014, Plaintiff states he delivered to Booth a request slip explaining that he did not feel comfortable participating in any interviews and asking for her to write a response to him regarding why she wanted to interview him and what help was available from the NBCI psychology department. As of December, 2014, Plaintiff had not received a reply. *Id*., p. 10.

**Standard of Review**

A.    Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243

(4th Cir. 1999).  The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007).  Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.  *Id*. at 563.  The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

B.     Motion for Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all

inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Id.* at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact.  No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

**Analysis**

A.     Excessive Force

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U. S. 312, 321 (1986).  The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkens v. Gaddy*, 599 U.S. 34 (2010).  The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id*. at 34.

Pennington avers that the use of force alleged by Plaintiff never occurred.  ECF No. 24-5.  Pennington confirms that he interviewed Plaintiff in January of 2014, regarding his complaint about the windows being closed.  Pennington avers that he did not use any derogatory language toward Plaintiff and did not grab, push, drag, or otherwise assault Plaintiff. *Id*.  There are no records of a use of force or serious incident report concerning Plaintiff occurring in January of 2014.  ECF Nos. 24-10; 24-11.  Plaintiff's medical records reflect he filed a sick call slip in March of 2014, alleging he had submitted four prior sick call slips which had been ignored.  He indicated that he had left shoulder pain resulting from his being cuffed from behind on January 21, 2014.  ECF No. 24-12, pp. 33-35.  He was provided muscle rub. *Id*., p. 25.

Plaintiff, the non-moving party, must establish the existence of a genuine issue of material fact by presenting evidence on which a fact-finder could reasonably find in his favor.  Plaintiff has failed to submit any evidence to support his claim, or to put the material fact of this case--the use of force against him--in dispute.  *See generally Gray v. Spillman,* 925 F.2d 90 (4th Cir. 1991).  Although the non-moving party may rely upon a verified complaint when allegations therein are based on personal knowledge, *see Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991), Plaintiff's Complaint and Amended Complaint are not verified.

B.      Conditions of Confinement

Defendants offer that NBCI was opened in August of 2006 and became fully operational in March 2008.  ECF No. 24-13, p. 3.  NBCI houses adult male inmates classified as "Max. I" and "Max II" security levels.  "NBCI provides intensive and specialized staff supervision and more restricted confinement for inmates assigned to maximum security based upon correctional factors such as discipline record, housing unit adjustment, work performance, propensity towards violence, etc.  Inmates at NBCI pose a high risk of violence, disruption and potential for escape and cannot be safely managed in any other type of correctional facility or lesser security."  *Id.*

Frank Bishop, Acting Executive Director-North Region, avers that HU 1 at NBCI was designated as the primary segregation unit.  ECF No. 24-14.  HU 2 was designated as a Multi-Classification Unit utilized to house inmates that are classified as Maximum II, inmates that require special programming and/or require mental health attention, known as "Special Needs Inmates," and for inmates coming off of segregation who demonstrated behaviors in the past which would limit their chances of being able to immediately adjust to a less structured environment such as HU 3 & 4, which are general population units.  *Id.*

NBCI was placed on institutional lockdown on August 5, 2013, due to numerous inmate assaults on staff and other inmates. *Id*. The entire inmate population at NBCI was reviewed in order to reduce the frequency of assaults. Staff endeavored to separate the inmate population into housing units, taking into consideration the inmates' past behavior as well as institutional adjustment. During the lockdown, due to security concerns and staffing, showers and recreation were limited. Inmates were permitted to exercise in their cells and showers were limited to one or two per week. *Id*. Other that HU 1, units began to come off lockdown in March of 2014. The general populations in HU 3 and 4 came off lockdown and returned to normal operational status first. Plaintiff's housing unit, HU 2 resumed normal operations in August of 2014. *Id*.

Plaintiff filed an ARP on December 26, 2013, complaining that the windows in his housing unit, HU 2, were sealed shut. He claimed that his cell was not properly ventilated and any time chemical agents were sprayed on the unit an excessive amount would be drawn into his cell. ECF No. 24-6, p. 1. Plaintiff's complaint was investigated and the Warden responded on January 29, 2014, advising Plaintiff that the windows on HU 2 were closed for security and cost savings due to the climate during the colder months. Plaintiff was advised that during warmer weather the windows may be opened unless Plaintiff violated the privilege. Plaintiff was further advised that if there was a medical issue which required the windows be open to contact the Medical Department in order to be evaluated. The ARP was dismissed. *Id*., p. 1 & 3.

Housing cells at NBCI are a total of 82.6 square feet. ECF No. 24-16. The sink/toilet combination takes up 11.7 feet. The bunks occupy 15.6 feet of space and shelving 2.4. The unencumbered space in the cell equals 15.7 feet. *Id*.

NBCI is audited by the Maryland Commission on Correctional Standards ("MCCS") to insure all correctional facilities are operated in accordance with state policies and procedures.

NBCI was audited by MCCS in August of 2012.  ECF Nos. 24-18 – 24-21.  The audit noted that NBCI was in compliance with a majority of the standards.  Seven deficiencies were noted, including that ARPs were not addressed within the specified time, and disciplinary hearing were not held in a timely fashion.  ECF Nos. 28-18; 28-19.  NBCI received a compliance score of 88% regarding inmate security and well-being standards and 100% compliance with medical, dental, mental health, food services, housing and sanitation standards.  ECF No. 24-20, p. 3.  A Security Audit Compliance Plan was signed by Warden Bishop on June 6, 2014, noting that at that time, compliance had been attained in all areas noted deficient, except medical screenings and annual physicals and tuberculosis testing for dietary staff and inmates involved in food preparation.  ECF No. 24-21.

Plaintiff's medical records reveal that he has been seen in the medical department due to dietary concerns and dental issues.  He requested a kosher diet and a high calorie diet.  ECF No. 24-12, pp. 2-10, 40-52.  From December 2013 through January 2014, Plaintiff was treated for nosebleeds and complaints of nausea and dizziness, which he attributed to the lack of ventilation in his cell due to the windows being sealed.  *Id.*, pp. 19-32.  Plaintiff was provided nasal spray and advised to increase his fluid intake.  *Id.*  On January 8 and 14, 2014, Plaintiff was seen by Nurse Cortez and requested a medical order that his windows be opened.  *Id.*, pp. 25, 29.  On January 14, 2014, Cortez noted medical did not have the authority to order Plaintiff's windows opened.  *Id.*, p. 29.  Plaintiff advised Physician's Assistant Quinta Lum, on January 23, 2014, that he was pursuing a legal case regarding the climate in his cell.  *Id.*, p. 31.  Plaintiff was provided nasal spray and advised to increase his fluid intake to treat intermittent nosebleeds.  *Id.*, pp. 19-32.

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment.  *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981).

However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id*.  In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that "the deprivation of [a] basic human need was *objectively* sufficiently serious," and that "*subjectively* the officials acted with a sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted).  "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) citing *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded.  *See Wilson*, 501 U. S. at 298.  In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. North Carolina Dept. of Corrections*, 612 F.3d 720, 723 (4th Cir. 2010), quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002).  Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law.  *See Maciariello v. Sumner*, 973 F. 2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury.  "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993).  "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim

regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003).

Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of

a serious or significant physical or emotional injury resulting from the challenged conditions. *See*

*Odom v. South Carolina Dept. of Corrections*, 349 F. 3d 765, 770 (4th Cir. 2003).

Defendants' actions are not actionable unless "in light of preexisting law the unlawfulness

of those actions is apparent." *Iko*, 535 F. 3d at 238 citing *Anderson v. Creighton*, 483 U.S. 635,

640 (1987). "We do not require of such officials the legal knowledge culled by the collective

hindsight of skilled lawyers and learned judges, but instead only the legal knowledge of an

objectively reasonable official in similar circumstances at the time of the challenged conduct."

*Johnson v. Caudill*, 475 F. 3d 645, 650 (4th Cir. 2007).

The conditions as described by Plaintiff were not so severe that Defendants could be

charged with "fair warning that their conduct was unconstitutional." *Ridpath v. Bd. of Governors*

*Marshall Univ.*, 447 F. 3d 2929, 313 (4th Cir. 2006). The discomforts experienced by Plaintiff in

being housed at NBCI in general, and caused by the lockdown specifically, were restrictive and

harsh, but did not impose cruel and unusual punishment. This conclusion is supported by the

absence of proof of significant, serious physical or psychological injury resulting from the

conditions described. In determining whether the challenged conditions amount to punishment, it

is not the province of this court to determine how a particular prison might be more beneficently

operated; the expertise of prison officials must be given its due deference. *See Sandin v. Conner*,

515 U.S. 472, 482 (1995). Defendants are entitled to summary judgment on this claim.

C.      Designation as a member of STG

Plaintiff's claim that he was erroneously designated as a member of a STG also fails.

Prisoners have a limited constitutional right, grounded in the due process clause, to have

prejudicial erroneous information expunged from prison files and they are deprived of this right if prison officials refuse to expunge material after being requested to do so.  *See Paine v. Baker*, 595 F.2d 197, 201 (4th Cir. 1979).   However, it is not sufficient that a prisoner simply disputes evaluations and opinions regarding him; federal courts will not second-guess these evaluations. The erroneous information must have been relied on to a constitutionally significant degree in order to state a claim.  *Id*.  "If the information is relied on to deny parole or statutory good-time credits, or to revoke probation or parole, the inmate's conditional liberty interest is at stake and the due process clause is called into play."  *Id*. at 202, citing *Wolff v. McDonnell*, 418 U.S. 539 (1974).

Sgt. David Barnhart, NBCI's Intelligence Department avers that on August 7, 2009, Plaintiff was validated as member of the "Rollin '20's Bloods" STG while housed at Jessup Correctional Institution.  ECF No. 24-24.  During Plaintiff's intake interview, Plaintiff denied any gang affiliation; however, he then stated he was a member of the Rollin' 20's Bloods when he was home.  It was noted that Plaintiff has two Bloods related tattoos.  As such Plaintiff was validated as member of a STG based on his own admission and his tattoos.  *Id*.

After discussion with Zies regarding his concerns over his classification, Plaintiff was directed to raise his concerns regarding his STG designation with the Intelligence Department ("Intel").  ECF No. 24-23, p. 5.  Plaintiff wrote to Intel on October 15, 2013, requesting that his validation as STG member be stricken.  Intel advised Plaintiff they had sufficient evidence to support the validation.  Barnhart avers that Intel does not have more recent evidence of Plaintiff's STG involvement, but they continue to monitor Plaintiff.  ECF No. 24-24.  Plaintiff's validation as an STG member will be reconsidered as long as he remains infraction free and does not become involved in STG activity.  ECF Nos. 24-24; 24-26.

Plaintiff has failed to allege what, if any, adverse impact he has suffered due to the inclusion of the alleged false information in his file. Plaintiff's classification to MAX II security level was not based solely on his verification as a STG member, but on his recent weapons charge, which alone provides a basis for the increase in security level and denial of programming.

D.      Programming/Housing Assignment/Classification

Bishop avers that assignments and classification of inmates are made taking into consideration the inmates' needs, public safety, and the safety and orderly operation of the facility. ECF No. 24-14, p. 2. NBCI Information Bulletin #02-14 provides guidelines for the classification of inmates to Maximum II security level (MAX II). ECF No. 24-15.

Review for MAX II designation is to occur within 60 days of an inmate's arrival at NBCI. The following criteria are considered to determine suitability for MAX II designation: serious assault on staff or another inmate within the past five years; escape form secure confinement housing; an incident resulting in the death of another while incarcerated; sexual assault on staff or an inmate while incarcerated; and verified behavior detrimental to the operation or security of a DPSCS facility, including STG activity within the past five years. *Id.*, p. 1. An inmate designated MAX II continues to receive yearly security reviews. *Id.*, p. 2. An inmate may appeal the decision to classify as MAX II through the Inmate Grievance Directives. *Id.*, p. 2.

A security classification review was conducted for Plaintiff on December 27, 2012. ECF No. 24-22, pp. 1-2. At that time it was noted that Plaintiff was serving a disciplinary segregation sentence and was to remain maximum security. The recommendation was approved by the Warden's designee. *Id.*, p. 2.

Plaintiff's next classification was held on December 3, 2013, by Zies. *Id.*, p. 3. Plaintiff did not attend due to the lockdown, *Id.* pp. 3-4; ECF No. 24-23, p. 7. Case management

recommended a decrease in Plaintiff's security level; however, the case manager recommended overriding the recommendation due to Plaintiff's overall poor adjustment history, including his gang affiliation, escape history, and a documented staff assault. ECF No. 24-22, p. 4. It was noted that Plaintiff was assigned to the job bank as a sanitation worker and was not earning days for his job assignment at that time. It was also noted that Plaintiff had his GED; and had received numerous adjustments for weapons violations and staff assaults since 2008; and his adjustment history was noted as poor. ECF No. 24-22, pp. 3-4. The security classification was approved by the Warden's designee on December 4, 2013. *Id.*, p. 4.

Plaintiff's next scheduled classification review occurred on May 12, 2014. *Id.*, p. 5. He was advised at that time that a recommendation was made to increase his security status from Maximum I to Maximum II due to the receipt of information from the intelligence department. *Id.*, pp. 5-6. Zies also noted Plaintiff received a serious weapons charge in 2012. *Id.*, p. 6. His verified behavior was considered detrimental to the operation of the institution and safety of staff and other inmates. ECF No. 24-23, p. 5. During his classification review, Plaintiff indicated that he "knew this would happen" and refused to cooperate with the rest of the review. *Id.* He was advised to address his concerns with Intel. *Id.* Warden Bishop approved the classification on May 14, 2014. ECF No. 24-22, p. 6. Additionally, it is noted that Plaintiff had a category one weapon violation on October 26, 2012. ECF No. 24-24, p. 4. Plaintiff spoke with Zies regarding his concerns over his classification on August 13, 2014, and was directed to raise his concerns regarding the STG classification with Intel. ECF No. 24-23, p. 5.

In order to comply with the Prison Rape Elimination Act, DPSCS has developed policies and assigned responsibilities for screening inmates to assess the risk of the inmate being sexually abused or being sexually abusive toward another inmate. ECF No. 24-32. NBCI.ID.050.0030.1

was implemented to reflect the facility's zero tolerance regarding sexual misconduct and establish procedures for reporting, responding, and resolving complaints of sexual assault. *Id.*

During his classification review in May, 2014, Plaintiff completed the PREA survey to the best of his ability. ECF No. 24-23, p. 5. On August 13, 2014, Zies spoke with Plaintiff regarding his concerns regarding his classification and PREA designation. Case notes reflect Zies clarified with Plaintiff his PREA score, which is entirely unrelated to a sexual offender registry, and noted Plaintiff was confused regarding same. *Id.* pp. 4-5.

On September 2, 2014, Zies was contacted by the Social Work Supervisor, Ms. Rozas who advised that she had re-assessed Plaintiff and it was determined that he would not be considered for PREA or be flagged as a vulnerable individual. ECF 24-23, p. 4. Zies noted that the issue in Plaintiff's PREA designation arose due to discrepancies in whether Plaintiff had received special education services. *Id.* pp.1-4. She documented her efforts to discern whether Plaintiff, who reported receiving special education services, had ever actually received same. *Id.*

Defendants offer that a variety of programs are available to inmates to increase their educational levels. ECF No. 24-13, p. 4. Programming is based upon the needs of the inmate and the institution. *Id.*, p. 5. There is an undefined "structured program of recreation and leisure time activities" for inmates at NBCI. *Id.*, p. 4. Additionally, religious and volunteer activities are available to inmates. *Id.*, p. 5.

It is well established that prisoners do not have a constitutional right to access programs or to demand to be housed in one prison rather than another absent a showing of significant hardship. "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution."

*Meachum v. Fano*, 427 U.S. 215, 224 (1976); s*ee also Sandin v. Conner*, 515 U.S. 472 (1995) (requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest).  Plaintiff does not have a right to be housed in a particular prison or participate in a particular program, and these allegations must be dismissed.  "In formulating and executing decisions relating to cell assignments, we must allow prison authorities the discretion to take into account the particular safety and security concerns facing male inmates, even though such considerations result in disparate treatment based upon gender." *Veney v. Wyche,*  293 F.3d 726, 734 (4th Cir. 2002) (segregation of homosexual male inmates).  Plaintiff was provided the opportunity to participate in his security classification review and to appeal the determination of his MAX II designation.  Nothing more is constitutionally required.

Likewise, to the extent Plaintiff clams that his assignment to certain housing within the prison prevented his ability to be assigned a prison job, his claim is unavailing.  To show a civil rights violation with respect to a prison job assignment Plaintiff would have to show that the actions taken against him impacted on the exercise of a constitutionally protected right.  Prisoners, however, do not have a constitutionally protected right to work while incarcerated, or to remain in a particular job once assigned.  *See Awalt v. Whalen*, 809 F. Supp. 414, 416-17 (E.D. Va. 1992); *Altizer v. Paderick*, 569 F. 2d 812, 815 (4th Cir. 1978).  Moreover, the expertise of prison officials in matters of security must be given its due deference.  *See Sandin v. Conner*, 515 U.S. 472, 482 (1995).

Mail/ARP claims

Mary Jane Rose, Office Clerk II, NBCI/WCI Mailroom, avers that all incoming and outgoing mail is processed in accordance with approved policies and directives of DPSCS.  ECF No. 24-33.  Rose avers that to her knowledge, Plaintiff's mail was not withheld, delayed or not

processed when the mail was in compliance with approved policies.  *Id.*  Rose states that all legal mail is logged for record-keeping purposes and is forwarded to the proper housing units for delivery to the inmates.  The Mail Log is maintained by mailroom staff who document the names and identification number of the inmate recipient, the sender of the mail, whether the mail was received, and the signature of the inmate.  Inmates sign in order to acknowledge receipt and acceptance of legal mail.  Only incoming legal mail is logged.  Outgoing mail is not logged.  Rose avers that to the best of her knowledge and belief mailroom staff have not hindered the sending or delivery of Plaintiff's mail.  *Id.*  Plaintiff's ARP index reflects that from February 22, 2010 to January 8, 2014, he filed 27 ARPs.  ECF No. 24-7.

Prisoner claims regarding legal mail are typically analyzed as access to court claims.  To state a constitutional claim for denial of access to the courts, a prisoner must show that the alleged shortcomings "hindered his efforts to pursue a legal claim."  *Lewis v. Casey,* 518 U.S. 343*,* 351 (1996).  Plaintiff has advised of no actual injury or specific harm which he suffered as a result of the mishandling of his outgoing legal mail.  Likewise, to state a claim based on delay or non-delivery of legal mail, a prisoner must allege adverse consequence as basis for allegation that delay or non-delivery deprived him of meaningful access to courts.  *See Lewis*, 518 U.S. at 349*; see also Morgan v. Montanye*, 516 F.2d 1367 (2d Cir. 1975) (single interference did not violate Sixth Amendment).  Here, Plaintiff has failed to demonstrate actual injury as a result of any irregularity with the processing of his mail.

In regard to Plaintiff's claim that incoming legal mail was improperly handled, his claim also fails.  Isolated instances of mishandling of inmate mail do not constitute valid constitutional claims.  *Buie v. Jones*, 717 F.2d 925, 926 (4th Cir. 1983) (isolated incident of mishandling does not show actionable pattern or practice).  Occasional incidents of delay or non-delivery of mail do

26

not rise to a constitutional level. *Gardner v. Howard*, 109 F.3d 427, 430-31 (8th Cir. 1997); *Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir. 1990). The only evidence Plaintiff offers of injury are conclusory statements that the conduct of correctional staff violated his constitutional rights. Without greater specificity, Plaintiff's claims fail.

To the extent Plaintiff alleges there were problems with the processing of his administrative remedy requests, his claim likewise fails. While the long standing rule has been that prisoners have no constitutional right to participate in an institutional grievance procedure, *see Adams v. Rice*, 40 F. 3d 72, 75 (4th Cir. 1994), with the passage of the Prison Litigation Reform Act (PLRA),  42 U.S.C. § 1997e(a), the issue is less clear. The PLRA requires exhaustion of administrative remedies before a federal action concerning prison conditions may be filed by a prisoner. The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Further clarification regarding exhaustion as a pleading requirement was announced by the United States Court of Appeals for the Fourth Circuit in *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F. 3d 674 (4th Cir. 2005), wherein the court held, "an inmate's failure to exhaust his administrative remedies must be viewed as an affirmative defense that should be pleaded or otherwise properly raised by the defendant." *Id*. at  681.

To the extent that a prisoner's attempts to exhaust the administrative remedy process are thwarted by prison officials' misconduct that evidence may be presented in response to the affirmative defense. *Id*. at 682. Thus, an inability to access the administrative remedy procedure based on an alleged refusal by prison officials to enforce the rules governing the process does not

run afoul of the due process clause.  Assuming, *arguendo*, that Defendants did not satisfactorily investigate or respond to Plaintiff's remedy requests, Plaintiff has not alleged, much less demonstrated, any injury as a result of the alleged failure to sign off or process his ARPs.

E.    Mental Health Care

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003), citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991).  In order to state an Eighth Amendment claim for denial of medical care, a Plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There is no essential distinction between the right to medical care for physical ailment and the right to psychiatric or psychological care for mental ailments. *See Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977).  Plaintiff, as an incarcerated person, "is entitled to psychological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial."  *Id.*, at 47–48.  The *Bowring* court further concluded that the right to such treatment is based upon the essential test of medical necessity and not upon a belief is that care is merely desirable.  *Id.* at 48.  "Disagreements between an inmate and a physician over the inmate's proper care do not state a § 1983 claim

unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998).   Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present.  *Id.* at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

Mental health care is provided at NBCI through the Behavior Management Program, Special Needs Unit, Crisis Intervention, and individual and group therapy.  ECF No. 24-13, p. 4. Mental health services are provided in the least restrictive correctional environment for mental health inmates.  *Id.*

Plaintiff's psychology records reveal that Plaintiff was seen by Laura Booth (formerly Moulden), Licensed Clinical Professional Counselor on April 18, 2014, based on his own self-referral.  ECF No. 24-12, p. 36.  Plaintiff indicated he wanted to see what types of mental health services were available to him.  He stated that he had been irritable and thought he might benefit from speaking to someone.  *Id.*  Booth described Plaintiff as guarded and vague.  He stated that he did not feel comfortable revealing himself to someone he did not know.  *Id.*  Booth attempted to build rapport with Plaintiff by gathering history as he had rarely been seen during his incarceration.  Plaintiff reported he had been diagnosed with ODD, Bipolar disorder, and ADD as an adolescent and had been hospitalized at 5 and 12 years of age.  He expressed anxiety about his release in 2018, that he would not have the skills to succeed.  Booth noted that Plaintiff would be

seen in three weeks for further assessment.  Booth requested Plaintiff think about the specific problems and goals he had for therapy.  *Id.*

Plaintiff was seen by Booth on May 15, 2014, for follow up.  *Id.*, p. 39.  At that time he provided documentation regarding his hospitalization for an overdose when he was 13.  Plaintiff reported that he was just trying to take more pills to sleep and woke up in the hospital.  *Id.*  It was noted that Plaintiff's psychiatric diagnosis was bipolar disorder.  Plaintiff remained vague but indicated his desire to continue seeing Booth if it would help him progress beyond his current housing unit so he could prepare for release.  *Id.*  Plaintiff was advised that Moulden would review Plaintiff's base file and history to see if he might be eligible to move and was asked to return in one month.  *Id.*  It does not appear that he was rescheduled.  His subsequent sick call requests did not seek follow-up psychiatric care but rather pertain to dietary issues, dental authorization and lab work.  *Id.*, pp. 40-52.

Plaintiff, the non-moving party, must establish the existence of a genuine issue of material fact by presenting evidence on which a fact-finder could reasonably find in his favor.  Plaintiff has failed to submit any evidence to support his claim that he was provided constitutionally inadequate care.  Plaintiff has failed to plead, much less establish, that he suffered from serious psychological illness.  To the contrary, Plaintiff self-referred to see whether counselling would assist him in reducing his security classification; a laudable goal, but not evidence of a serious psychological need that was ignored.  Accordingly, Plaintiff's claim shall be dismissed.

F.    Policy

To the extent Plaintiff complains that Defendants failed to follow established DPSCS policies and procedures, his claim fails.  If written directives were not followed to the letter, the adoption of procedural guidelines does not give rise to a liberty interest; thus, the failure to follow

regulations does not, in and of itself, result in a violation of due process.  *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987).[7]

G.      Retaliation

Plaintiff claims that Pennington retaliated against him for filing internal complaints. Pennington avers that he has never interfered with Plaintiff's medical treatment, mail, or the filing of ARPs.   Pennington further avers that he has never instructed anyone to retaliate against Plaintiff and has no knowledge of staff harassing or threatening Plaintiff.  ECF No. No. 24-5.

In order to prevail on a claim of retaliation, Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right."  *Adams v. Rice*, 40 F.3d at 75.  "A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone."  *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim).  Plaintiff offers nothing in support of his claim other than self-serving conclusory statements and there is nothing in the record suggests that Defendants acted in the manner alleged.  "In the prison context, we treat [claims of retaliation] with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'"  *Cochran v. Morris*, 73 F.3de 1310, 1317 (4th Cir. 1996). Plaintiff cannot prevail on this claim.

---

[7]        Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a prison directive or regulation does not give rise to a federal claim, if constitutional minima are met.  *See Myers v. Kelvenhagen*, 97 F.3d 91, 94 (5th Cir. 1996).

**Conclusion**

Defendants' dispositive motion will be granted.  A separate Order follows.


Date: July 28, 2015                            _____/s/_____
                                               DEBORAH K. CHASANOW
                                               United States District Judge